cetera. With that said, we call the first case, Gonzales v. Harris County, Mr. Dunn. May it please the Court, my name is Chad Dunn, I represent the Plaintiff Appellants and Cross Appellees in this case. I have the pleasure of representing a handful of Latino leaders in Harris County, Texas who come to this Court asking it to enforce the Voting Rights Act against Harris County, Texas. Insofar as Harris County, Texas failed to comply or even tried to comply with Section 1, protecting the Latino citizens in the district. Now the County is going to and has defended this case on two bases. The first is essentially an effort to pit African American and Latino citizens in the county against one another and falsely claim that both cannot enjoy protected districts under the Voting Rights Act. And as I'll demonstrate later, that's a simply false... Dunn, you're mighty wound up for 9 o'clock in the morning. Well, I apologize, Judge. If I feel that this case... You can't give out terms like falsely and this, that, and the other unless you've really got a substantial basis for using that. I do have a substantial basis, Your Honor, and in fact the District Court on every issue except one found in favor of the plaintiffs in this case. I would like to start with the population growth in Harris County because I think it's the starting analysis to consider the case. Up until 2010, the Census designated that there was a 20% growth in Harris County. In fact, nearly 700,000 people grew in the county population. 80% of that growth, 80% of it was Latino population. Half a million people were added to the county in that decade that were Latino citizens. There was a net reduction of Anglo population of 83%. Excuse me. You said Latino citizens? No. This is the general population. No, sir. You said Latino citizens. So you need to be real careful about that. I beg your pardon, Judge. State that, please. These figures are population figures. Right. Not citizen figures. That's true. So it's an 80% increase in population, 500,000 people, a decrease in Anglo population, 83,000 people, and an increase in African-American population of 135,000 people. Now Precinct 2 had been historically represented by a Latino candidate of choice, Sylvia Garcia, until the 2010 elections when an Anglo-preferred candidate defeated her in that election by a few hundred votes. Those events, both the census figures and the events of the 2010 election, are what set up how redistricting took place in Harris County. As a result of the growth, though, the experts testified and analyzed in the case candidates and whether they were supported by Latino voters, African-American, Anglo voters, or a coalition. And the testimony is unrebutted and, in fact, was conceded by Mr. Walden, a person who worked for Mr. Mormon, the Anglo-preferred candidate of which I refer, it was conceded that Mr. Walden was not the Latino candidate of choice, and, in fact, they determined that with regression analysis and by analyzing election returns on a precinct-by-precinct basis and comparing those returns with the population in each of those precincts. So you're able to determine that overwhelmingly Anglo precincts support this candidate, overwhelmingly Latino precincts, African-American, etc. But that's post-election, right? Yes, Your Honor, that's post-election. All right. And, of course, this isn't some sort of new science. This is what has been relied upon in voting rights cases, you know, for 30 years. In fact, it's been cited time and again, these regression analysis, by the U.S. Supreme Court as how courts are to utilize the data to determine who the candidates of choice are. So as a result of the 2010 election, and Mr. Walden testified to these facts in the records, his office, Mr. Mormon's office, analyzed individual voting precincts in Harris County and ultimately selected a handful of precincts that were overwhelmingly Anglo in population and, and this is the important part, not only overwhelmingly Anglo in population, Mr. Walden analyzed how they performed for Mr. Mormon in the recent election he had against Sylvia Garcia. And Mr. Walden was able to determine that these precincts, overwhelmingly Anglo and overwhelmingly in support of Mr. Mormon, ought to be placed into Precinct 2, a district that even Harris County concedes had been a Latino-influenced district. The result of this, as the district court found, is that the map Harris County adopted, referred to as Revised A-1, would have the effect of continuing to prevent Latino citizens from electing the candidate of choice in Harris County. There's really only one dispute in this case. What is the, as I understand it, the total population is in Harris County of four, some 33 percent, yet the term Anglo is used to differentiate between Latino and Anglo. And then the balance, I forget the other percentages, but the Latinos comprise by far the largest percentage of persons in Harris County. What is the percentage of voting Latino citizens in Harris County? I, I, I want that figure. I don't have that to provide to you at the podium today. I'd be happy to submit it. It was in the court record. I just don't have note of it and recall it. It is some degree. Is that critical? I beg your pardon? Isn't that critical? It's not critical because the question in this case is whether a district of greater than 50 percent citizen voting age population, Latino citizen voting age population. Citizen is the important term here. Certainly. And, of course, it emphasizes the fact that not all Latinos in Harris County are citizens. No question about that. And there's no question that the evidence the plaintiffs put on in this case dealt with citizen voting age population. There's also no question, as the district court found, that plaintiffs drew a number of maps, three maps in particular that we focus on, that had precinct two at greater than 50 percent citizen voting age population. So that's why to the, to the court's question as to what the total citizen voting age population for Latinos is in the county isn't the critical inquiry. The critical inquiry under jingles one is whether there is a sufficiently compact and numerous Latino population. The way you show that under this court's opinion in the Chen case and others, Bartlett v. Strickland, is you draw a map that is greater than 50 percent citizen voting age population. That eliminates any concerns there may be over people in Harris County who may not be a voting age or who may not be U.S. citizens. In this case, as the district court found, the plaintiffs met that burden. Where the district court erred is it added an additional jingles precondition. So typically under the jingles opinion, there were three preconditions that had to be met. The numerous and compact one, that's one. The Anglo block voting, that's three. And that minority citizens vote as a block, that's two essentially. The district court agreed with us on two. The district court agreed with us on three. And the district court even went through the totality of the circumstances and said they weighed in favor of the plaintiffs. The only rub in this case is on one. And what the district court essentially did was ignore precedent from this court, ignore precedent from the Tenth Circuit and from the Eleventh Circuit, and added an additional 1A jingles requirement. What the district court decided was in addition to showing that there is sufficiently compact and numerous Latino population, you also have to show that you can draw an additional district that is compact and numerous and that essentially falls within the lines of the incumbent plan. What the district court said is that if you move too many streets, roads, or facilities, if you change too much of the boundaries of the plan, then you can't comply with jingles precondition one. Don't you use the term for that traditional redistricting principles? Isn't that the encompassing term? The traditional redistricting principles is a term that applies to a plan that's actually put into service. And so, for example, as the Tenth Circuit said in the Sanchez case, and which was also supported in this court's decision and the what. I won't mince words with you on the definition, but it seemed to me your reply brief, you backed off a little bit from your principle brief about, as I understood your contention that the district court erred, we'll use the term liability phase, by relying on traditional redistricting principles, and it seemed your reply brief backed off a little bit from that. That court can consider those principles. You said she just considered them too heavily. Well, if I understand the court's question, I'll see if I can answer it in the context of the case. The Sensley case is really the singular crutch on which Harris County seeks to legally defend this case. In Sensley, they said that we have to look at the 50 plus percent CVAP, we've got to look at compactness, which the district court both did and found in the plaintiff's favor in this case. But, what we also have to do is, if we find that there's not numerosity and compactness, one of the other things that can reinforce our view that there isn't numerosity and compactness is by looking at traditional redistricting principles. But the court didn't reverse this court's finding in West Wego and in the Houston versus Lafayette County case, where in both of those cases the court found, in particular Lafayette County, which was later cited by the Tenth Circuit in the Sanchez case, in both of those cases the court recognized, if we hold plaintiffs in a Section 2 case to traditional, so-called keep-the-old-districts, the old districts that were designed, in many cases, not to elect candidates of choice for African Americans and Latinos. So if we hold Section 2 to the standard of keep traditional redistricting principles in place, what we're really saying is keep the incumbent districts in place. I'll just read to you from your reply brief, at page 15, Sensley's approach to compactness makes clear that additional factors besides geographic compactness, such as whether a constitutive district encompasses minority populations that share common interests or preserve the core of existing districts, are helpful to the compactness analysis but do not weigh more heavily than a finding of geographic shape. So how did the district judge here err in perhaps weighing more heavily than finding compact geographic shape? Because the difference in Sensley, as cited there, is in Sensley the court had found that there wasn't compactness and numerosity to begin with. But the district in Sensley was lights and darkness different than the district here. It's what, in Sensley it was a barbell district, they had essentially taken, not essentially they did, they took two separate cities, 15 to 17 miles apart, the record's ambiguous on that part, and put them together by connecting them through a highway in what redistrictors call a barbell district. And that's in the historical context of African Americans had already achieved two performing black districts in the same jurisdiction. So what the lawsuit was attempting to achieve was a third performing district. What the court ultimately found is a barbell district that was essentially designed because the rest of the African American population already created two performing districts and couldn't be overwhelmingly disturbed. Those aren't compact districts. Here in Harris County, where you've got 40-something, as the court noted, 40.8% of total population Latino citizen, when you can draw multiple districts of different configurations, over 50%, and they're all essentially in the southeast part of Harris County, you have complied with Jingles 1. So you're saying the district judge did not commit an error of law, which we reviewed in Anovo, you're just saying the judge committed a clearly erroneous finding of fact? No, that's not true, Judge. We believe that the district... I'm just asking you, counsel, what are you claiming? Are you claiming error of law or clearly erroneous finding of fact? Error of law. Now, on the issue of what the shape of the district looks like and in compactness, the districts were drawn, and the parties conceded, and the court found, the demonstration districts that plaintiffs drew in this case were drawn to mirror those of the state senate districts and of the congressional districts, where in Harris County there is a performing Hispanic opportunity district adjacent to performing African American districts. There's no question, and there's no question that there are some population differences between those districts. Counsel, you mentioned earlier in your argument about this Precinct 2, where the Latino preferred candidate lost an election. Yes, Judge. A close election. How significant is that loss in your analysis? It goes to the fact that when an individual group of citizenry, and one as large as the Latino citizens, don't have any voice on their elected form of government, that when critical decisions are made, like redistricting and asset allocations, and not being at the table means getting left out, and not having a voice at the table after 2000... I guess what I'm asking is, do you point to that loss as some significant evidence of this opportunity to elect a Latino preferred candidate? Right. Well, the reason I raise that issue is because of the evidence in the record where, when the new plan was revised, Revised A-1 was adopted, the process by which it was decided precincts would be moved into, voting precincts, would be moved into the electoral precinct 2, the process used the incumbent Anglo preferred candidate staff, went about looking at individual voting precincts and determining the ones that overwhelmingly supported him. And one of those moved into precinct 2. So to the extent that, for example, let me use the numbers. The precinct 2 had become 55% Latino voting age population under the former census. So in other words, under the benchmark plan, the Latino voting age population was 55% in precinct 2. When the incumbent that won in 2010, along with his cohorts on the Commissioner's Court, went to work on precinct 2 and the revised precinct 2, they lowered that percentage to 34%. So in other words, they brought Anglos into precinct 2. And the reason they had to bring Anglos into precinct 2 was that was the only way that district was going to continue to perform for this candidate that won in 2010 by a handful of votes. The county knew and that candidate knew. But your Latino preferred candidate lost in what year? 2010. When it was 55% Latino. That's right. So what are you saying? You want it to be a higher percentage than that? No, actually, the remedial. You want a precinct with a higher percentage than 55? In fact, the district can have a lower percentage than 55%. Or the district could be the same as it was adjusting for population in 2010 and perform for a Hispanic preferred candidate. And that's a critical point that I want to make. So when Section 5 still applied to Harris County, the county was unable to get preclearance of this plan in time for the next election in 2012. As a result of that, the district court actually drew an interim map that was in use for two years. The county didn't appeal the imposing of that interim map. And that interim map, according to all the experts who analyzed it in this case, would perform or give a chance to Latino preferred candidates. As Justice Stevens says in an opinion in the Supreme Court, as long as Latino citizens would pull, haul, and trade, using Justice Stevens' phrase, they would have a chance of winning the district. They lost in 2010. That's conceded. We're not asking for anything better than they had in 2010. What Harris County did was they went and made it worse because they knew 2010 wasn't going to be the likely outcome in future elections. Harris County set out to pack the district with additional Anglo voters. And in addition to that... So no change at all would have been fine? No change at all would have been fine, except that the district was underpopulated. And so under the one person, one vote requirement, both Districts 1, which is the African American district, and District 2 had to take on population. So I say it's fine in terms of electoral performance. I don't want to unintentionally mislead the court in saying it was illegal. In other words, the new numbers compelled that there be some redistricting. That's true. There had to be some redistricting. And so what Harris County chose to do was it took Latino citizen voting age population from Precinct 1 and put it into 2, the African American district, for reasons yet to be explained. Wait. You said put it into 2, the African American district. I'm sorry. Put it into Precinct 1. So Latino citizenry in Precinct 1 was taken and put into electoral Precinct 2. And in addition, Anglo population in the northeast portion of Harris County was taken and put into Precinct 1, which had the result of substantially reducing the Latino population in Precinct 1, also reducing the African American population of Precinct 2. I got it reversed again. Increasing the Anglo population in Precinct 2 and decreasing the Anglo population. All right. Well, hang on. Slow down a bit. Okay. You got a red light, but Judge Barr still has a question for you. And then when he finishes, I've got a question. Yes, sir. It's a pretty fundamental question. And looking at the terminology you use in your blue brief at 20, you speak of the Supreme Court provided a framework in Gingles for determining whether a districting plan impairs the ability of minority voters to elect representatives of their choice. In that Latinos make the largest percentage of the population of Harris County, how are Latinos a quote minority, close quote? Assume, even though my time's expired, I should address the court. Judge Stewart just told you that. All right. Because the districts have been gerrymandered to ensure the result that three Anglo-preferred candidates get elected. You haven't answered my question. How are they a minority when they have the largest percentage of population in Harris County? They're a minority of the citizenry, and they do not have the ability to elect a candidate of their choice. And that is the Voting Rights Act definition of a minority. Even though they have the largest percentage in the county? Even though they do. And you're saying that's found expressly in the Voting Rights Act? I'm not going to say that that's written. What's your authority for that statement? My authority for that statement is Gingles and all the cases to come after it. I want you to give me a case that defines quote minority, close quote. I can't provide you a case that reads as Your Honor suggests. All right. Thank you. All right. Let me ask you. We're not trying to trap you. We're trying to make sure we understand your argument and you're sort of robust, going fast. I just want to make sure you don't misstate what you're saying. I'm following up on a question Judge Barsaw asked you, whether or not you are claiming on behalf of your clients an error of law or a clearly erroneous fact issue. And I understood you to say the district court committed an error of law. An error of law. Yes, Your Honor. All right. But I'm looking at your summary of the argument in your brief and you assert the error of law say succinctly by subsequently concluding that plaintiff appellants failed to satisfy the sufficiently large and geographically compact test under Gingles. The district court misapplied governing law and clearly erred in its findings of fact. Then your summary goes on for about four pages in a robust. I'm just trying to make sure you're not giving up on something you are arguing or spoke too fast or we have a clear understanding of if you're arguing both of those and which is. You follow me? We got you on your governing law, but are you maintaining as the brief does that you are asserting an error clearly, clear error of fact and succinctly without a lot of commas then tell me what the error on fact is. Do you understand my question? I believe I do, Judge. So let me see if I can formulate a succinct response. Well, I'll ask it this way. I just read you what the brief says. We agree with the brief. Okay. All right. So now succinctly tell me then if you are harnessed on an error of fact, just straightforward in a declarative sentence, just tell me what the fact issue is that you're alleging clearly erroneous. If the court finds that the district court wasn't making an error of law and that there really are additional requirements under Gingles one other than numerosity and compactness, then we get to the clear error question. So that's why they're both. I mean, the answer is it's both. We don't think that the district court properly applied the law. Okay. And if we're right about that, it's a clear error. I mean, it's a de novo standard. That's the end of the inquiry. If the district court disagrees with us and finds that no, the district court had the law right, then we go to the clear error and we claim that the district court was wrong on the facts. All right. Just want to make sure we've got you squared up. You've reserved some time for rebuttal to come back up, but at least we know what you're maintaining. All right. Thank you. Well, I just want to note, Judge Stewart, for purposes of this recording, that counsel, your comment just flies in the face of your reply brief at page 15, which I read to you, but there's no point in rehashing that. All right. Ms. Sandil for the county. May it please the court. Warning, Your Honors. Kelly Sandil on behalf of Harris County and County Judge Ed Emmett. There are a number of grounds on which this court should affirm the lower court's judgment in favor of the defendants in this case. How about starting with citing some authority to us to what is a, quote, minority, close quote, for Voting Rights Act purposes? Your Honor, I will be honest that I have never questioned the concept that Latinos are a minority for purposes of the Voting Rights Act. I cannot cite to you a case that makes that statement. It has been my assumption that protected classes inherently are covered by Section 2. But I apologize. I don't have a direct authority that addresses that because I've simply never looked at the possibility that they are not. Even though Latinos voting age in the population overwhelmingly have a larger percentage than other groups in that county? Yes, Your Honor. It's an interesting question for sure that I simply have never thought about. It's never dawned on me. I'm not sure why, but it has not. And I hear what Your Honor is saying. I simply don't have an authority that addresses that point. Thank you. So the numerous reasons that support affirmance in this case really have to do ultimately with the jingles test. And we as the county believes that affirmance is appropriate because the plaintiffs failed to meet their burden on both the first jingles prong and the third jingles prong. Now, the first jingles prong is the one that Judge Gilmour found the plaintiffs had not met. The third jingles prong is one that Judge Gilmour found they had met. That's the question of whether there is legally significant racial block voting in the relevant jurisdiction. We have raised a challenge to her finding on the third prong via a cross appeal, a conditional cross appeal. And we submit that the court can affirm this ruling on either the jingles one factor or the jingles three factor or both. I'd like to address the jingles one factor evidence first. The real issue with respect to the jingles one factor is indeed whether and to what extent a plaintiff in a Section 2 case must demonstrate a demonstrative map that meets traditional redistricting principles. The county's position in this case is that the law absolutely establishes that traditional redistricting principles are part of the compactness analysis under jingles one. Counsel, can you tell me what the preservation of incumbent constituent relationships has to do with traditional redistricting principles? Yes, Your Honor. So the preservation of incumbent constituent relationships is something that's been addressed by the Fifth Circuit and the Supreme Court. The idea there is not that there's a preservation of incumbent constituent relationships for the benefit of the incumbent. It's that there needs to be an attention in the redistricting process to the protection of incumbent constituent relationships because you do not want to That necessarily means you're protecting the incumbent then? In a way, Your Honor, but it also means that you're protecting the voter because when voters and citizens, residents are drawn into particular districts, they vote for their representatives. They vote for the services that they believe they're going to be provided based on being drawn into that district. That's particularly important here because Harris County's commissioner precincts, they deliver actual services. They're not just representative for purposes of taking votes. And that gets me to another question I have in that connection because there's a board of commissioners. I don't know. Yes, Your Honor. And there are how many on it? It's a court and there are four plus a county judge. All right. But does the commissioner operate independently so that if a constituent has a request, does that commissioner have a budget just for that precinct where that commissioner can allocate resources, fix a road? I don't know. Whatever. Yes. County commissioners do without any vote from the entire commission. A single commissioner can make those kinds of decisions. Yes, Your Honor. All right. And I believe that is in the record in this case is that they are independent with respect to their budgets and the way that they choose to meet the needs of their constituents. And so following on that, your question about what is the relevance of incumbent. Budget is set by the, I think you call it the court, isn't it? Yes, Your Honor. They set their own budget. I mean, they have a vote just like a budget set by a governmental entity and that allocates a certain amount to particular subparts of that entity. And here the four commissioners and the judge set a budget for the year and then there's an allocation to each of the four districts. Is that the way it works? Yes, Your Honor. And my understanding is that they have robust discussion about what the budgets of each commissioner will be relative to what that commissioner's particular precinct looks like, how many road miles are in it, those kinds of things. They sort of compete with each other over the available resources and arrive on some decision as to what the allocations will be per commissioner. And so the reason in that construct that traditional redistricting principles for Harris County have always respected the incumbent-constituent relationship is because when voters take a vote on who's going to represent them, they are assumed to be considering and caring about who that commissioner is and what services, what the priorities of that commissioner are. And so when you, if you were to do redistricting and start afresh every time and create whole new lines or make large changes to the existing lines, you would be fundamentally moving a lot of voters into a whole new precinct to be represented by a whole new individual that they didn't vote for. And I believe that the Sensley case, when read very carefully, acknowledges this point because it speaks to the importance of . . . And in terms of moving a lot of voters, the plans offered by the plaintiffs would have moved about 40 percent of . . . Yes, Your Honor. . . . voters in the county to different precincts. Yes, Your Honor. The plans offered by the plaintiffs in this case moved approximately 40 percent of Harris County's roughly 4 million residents. Did that answer your question? Yes, ma'am. Thank you. And so, that brings me to the point, obviously, that the disruption, the major disruption to the existing boundaries that was occasioned by the plans offered by the plaintiff is one way in which the court found that the plans did not adequately address or respect traditional redistricting principles. The court, however, also found other ways in which the plaintiff's maps did not respect traditional redistricting principles. One of those was that the plaintiff's maps split in half two very large cities, in terms of, you know, relative largeness of cities in the county. Two large cities that are located on the eastern side of Harris County. Those are the cities of Baytown, Texas and Pasadena, Texas. Baytown is roughly, I think, about 75,000 people. Pasadena, I think, is about 115,000 people. They're large. They are cities that are focused on the eastern side where you have a lot of maritime interests. You have a lot of energy interests. A lot of our plants are located out there in terms of refining and things like that. These are blue-collar workers. They have always been, both cities, the entirety of them, have always, or for a very, very long period, been in a single commissioner's court precinct. And that was Precinct 2. So, from the county's perspective, we believe the evidence supports and Judge Gilmour found that those cities represent communities of interest. Clear situations where people live together. They're home rule cities, so there's a delivery of services to the residents there by the cities. It puts those people in a situation where they're having a common experience. So, the idea in redistricting is that you don't split cities like that because then you end up with a situation where those individuals are not able to speak with a single voice in terms of their election of a county commissioner. And even though they are home rule cities that deliver services, the county commissioner impacts, that is over that area, impacts their lives. There is sort of hand-in-hand working between the county and the city. So, it's important that they elect a county commissioner, that they elect one with a single voice. And I believe, I mean, I think the case law is clear. Elect a commissioner with a single voice. Sorry, yes, elect a commissioner with a single voice. And I think the case law is clear. You're not suggesting that there aren't cities where part of the city is represented by one commissioner and another part is represented by a different commissioner. Your Honor, there are not. Residents of the county. And I guess the commissioners are concerned about residents of the county. You're correct. All right. Your Honor. And you are right that obviously the city of Houston is so large that the lines in any map are going to split through the city of Houston. But that's a large enough city that it's difficult to say that there's a confined community of interest necessarily with respect to all citizens of the city of Houston. And I will concede that the county's map, in this case, also split one city. It's Humble, Texas. You're not arguing that every small town is some kind of well-defined community of common interest. Not at all, Your Honor. All right. There are things called census designated places that are little areas that are recognized by the census. And certainly in redistricting, those sometimes get split. It really is a functional analysis of what is the nature of the city that's being split. And here, the testimony by the county's demographer, a gentleman who's a professor at the University of Houston, and his life's work has been Harris County and its demographic changes and redistricting it. He testified in great detail in the record about what he described the huge impact that would happen if you were to split the cities of Pasadena and Baytown into separate commissioner's court precincts. Now, give us the appellant's, I suppose, primary claim on asserting an error of law that the remedy phase was combined with the liability phase and that instead it should have been kept separate and allowed the county to work out through traditional redistricting principles, whatever the finding had been on compactness. Yes, Your Honor. Do you follow my question? I do absolutely follow your question. And I think Your Honor touched on perhaps earlier that in the lower court, it seemed that the plaintiffs were arguing that traditional redistricting principles should have nothing to do with the jingles analysis because their reasoning was a jingles map is nothing more than a demonstration map and how things actually end up is part of the remedy phase. It seems that they have backed away from that in their briefing to me. But if that is the argument here, I think it is wrong. I think the case law is clear in both Sensley and Abrams v. Johnson from the Supreme Court that traditional redistricting principles like respecting geographic boundaries, like maintaining communities of interest, are important to the jingles one analysis. I think I've spent time trying to figure out why would that be, where does that stem from? And I think where it stems from is if you go back to jingles and its original progeny, Justice O'Connor said something very important. She said the point of that first jingles prong is to allow courts to determine how difficult should it be for the plaintiff minority population to elect its candidate of choice compared against how difficult is it under the challenged plan or electoral process. And so in my mind, that figuring out of how difficult should it be necessarily entails, well, what do we recognize as the important aspects of redistricting? In other words, it acknowledges that redistricting doesn't take place in a vacuum. It's not a purely numerical exercise. It's an extremely fact-intensive functional process. And so I believe that the case law is clear that traditional redistricting principles and the degree to which plaintiff's plans comply with them is inherently a part of the compactness analysis that is required by the first jingles threshold. I want to touch on one other area where the lower court found that the plaintiff's maps failed to meet traditional redistricting principles, and that is the effect that their proposed maps would have on the existing minority opportunity precinct in Harris County, which is Precinct 1. Precinct 1 has been an African-American effective minority opportunity precinct in Harris County since the 1980s. Plaintiffs, well, start over. When the county began to do redistricting, Precinct 1 and Precinct 2 were very underpopulated. And so in order to get to that one-person, one-vote equality that was needed, the county had to add people, bodies, to Precinct 1 and Precinct 2. We've provided the court with copies of maps, and I think you can see, and they're in our brief as well, you can see that Precinct 1 and Precinct 2 lay right up against each other. And so the question was, where were these populations going to come from? And the county's map drawer was extremely cognizant that in adding people to Precinct 1, he needed to ensure that that precinct would continue to be an effective African-American opportunity district. And so what he did was to look at the options with the commissioners and to ultimately determine that the best move would be to reach up north of the existing Precinct 1 and grab some high African-American, high percentage African-American voting precincts that were up in the north near the Bush Airport. They were homeowners. They represented people who would be expected to stay in the area and continue to be residents of Precinct 1. So it was his determination and his extensive testimony that that was the best choice for Precinct 1 and that it would alleviate what was going on in the more urban part of Precinct 1, which is an outflux, really, of African-American folks. I mean, they're in Houston. You're saying that was his determination. That was his opinion. Sure. His opinion, though, I will say, based very much on detailed analysis. I mean, he looked at the 2008 presidential election, and he looked down to the voter precinct level. So there are tiny little boxes in terms of what we can do. That's the smallest sort of designation within the county. At least in part, he was making predictions, obviously based on his experience and all of that, about which African-Americans were at least categorically likely to stay and not move out of the precinct, those kinds of things. Absolutely, Your Honor. He was making an assessment based on his expertise in redistricting and his knowledge of the types of voters in different areas of the county. And so what he said was that those voters up north were stronger, more reliable voters than the other option, which is what the plaintiff's maps do, and that is to take Precinct 1 and get new voters by moving it southwest into Precinct 3, which is a majority, that precinct is a majority Anglo precinct, and the area that plaintiff's maps move Precinct 1 over into Precinct 3 is a very—they pick up a very rapidly shifting area where there are a lot of apartment dwellers. It's an area that saw a massive influx of folks after Katrina, and then there's been a lot of demographic changes in terms of that area becoming less African-American and more Latino, and those are expected to continue. And I will note that Judge Gilmour's lengthy order and findings in this case goes through in great detail the manner in which plaintiff's own witnesses agreed with this assessment of what was going on in that southwest area. It's known as ALEIF. I understand it. Precinct 1 became a black opportunity district around 1982, something like that. Was that a result of a court decision? I do not believe so, Your Honor. Why is there the big push to maintain it in that fashion 30-something years later when the whole population has shifted in Harris County? Your Honor, I think the reason that it needs to be maintained is because the demographer looks and says, okay, is there a minority group in Houston, a recognized minority group, that lives in such a compact fashion that it can be an effective opportunity district? And so what the demographer said here is absolutely African-Americans meet that standard in Harris County. The lines aren't going to need to be changed a little around the margins, absolutely. That happens every time we redistrict. They're moving, they're changing places, but they haven't become non-compact. And that brings up a good point because the real difference here is that the Latino community in Harris County doesn't live in a compact area. There's a lot on the east side, and I've provided the court with a handout of an exhibit in the record that shows where the concentrations of Latinos are. What percentage of the voting age population in Precinct 1 is African-American? So under the county's proposed new map? Yes, I believe that that percent is 39.2%. When it came time to redistrict, it was roughly 37%. And that is one point I want to make. I think I heard the appellate's counsel say that the county moved the African-American percentage in Precinct 1 down when it redistricted. That is absolutely not the case. The county moved the percentage up. It is true that the percentage has gone down since the county's 2001 map, and that's a reflection of the fact that African-Americans are kind of moving out of the county to some degree. And I also just, on that same point, around that same topic, I just want to make the point that while there was, I think counsel for appellant focused on there having been an interim map because the map here was not pre-cleared in time. That was simply a function of the time it took the Justice Department to analyze things. The map was ultimately pre-cleared under Section 5. I see that my time is up if there are no other questions. All right. Thank you, Ms. Sandia. Done. We'll back to you, Honorable. May it please the Court, in my final time before the Court, I want to address two primary categories of information. The first is the issue of the number of movements of people in places and cities, and the second is the issue of the ability to protect the African-American district while also complying with Section 2 and creating the Latino district. I'm going to start in reverse order. It should have been mentioned earlier by me, and I take responsibility for not doing so, but the expert that the county relies on in this case, Dr. Murray, was never asked to look at Section 2 and see if the Latino population in Section 2 of the law required the drawing of a district. So he never tried to draw a 50-plus citizen voting age population district. He never made any attempt, despite it being his job to do so, to make sure the county was in compliance with Section 2. That's a pretty important point you should have brought up on your opening argument. I should have. I'll bring it up now. And, of course, it was mentioned in both of our briefs. This isn't a new revelation. It deprives them of a chance, the appellees, of a chance to respond. Go ahead. I beg your pardon, Your Honor. With your hand there, I couldn't hear you. You said it deprives the appellees of a chance to respond, but go ahead. Well, I apologize. Of course, it was in the briefing. But another important point on that subject is that the notion that an African-American protected district can't exist alongside of the Latino preferred district first is disputed by the existence of state Senate districts and congressional districts that exist, but also in the demonstrative plans that the plaintiffs developed under Section 2. They increase, and Your Honor, Judge Graves just asked the African-American percentage in Precinct 1 and what it was under the old plan and under the county's new plan. And we agree. It's 39.2 percent under the county's new plan. The demonstrative plans that the plaintiff drew in this case had 48 percent African-American population in Precinct 1. And, unlike Dr. Murray, who testified he did no functional analysis, no election analysis, as to the performance of the plaintiff's plans and of specifically Precinct 1, plaintiff's experts ran elections, reconstituted elections, the gold standard of evidence in voting rights cases, and determined that Precinct 1, as drawn in plaintiff's demonstrative plans, that African-American district would continue to perform and overwhelmingly perform, which makes sense since the plaintiffs were adding 9 percent of African-American population to Precinct 1. That point of fact is also critical in seeing through what actually happened in the drawing of the maps in this case, because the county wants to reflect the situation of shoring up Precinct 1, but the reality is the Wallaceville Road area, the Hardy area, were Latino neighborhoods in Precinct 2 that were put into Precinct 1. We submit because they had sweetheart facilities in them that would add to a commissioner's budget. Those facilities were... Yes, sweetheart what? Facilities in them. They had the road and bridge facilities, the trucks, the tractors, the sort of things that add to an individual commissioner's budget. But it certainly wasn't done to shore up Precinct 1's African-American population, because it's undisputed that Wallaceville and Hardy area are overwhelmingly Latino areas. It's also undisputed that an enormous amount of Anglo population in Northeast County, Northeast Harris County, was moved into Precinct 2 as a result of the changes in 2010. So the last issue I want to deal with is this number of 40 percent that somehow... Was moved into the precinct by the maps or just by their own volition? No, by the map drawers. In fact, Mr. Walden and Mr. Mormon's office sat down and picked precincts in Northeast Harris County that overwhelmingly voted for him and that were also overwhelmingly Anglo and moved them into Precinct 2 as part of the redistricting. It wasn't natural population changes. The last point I want to make about this 40 percent of the population that's moved. First, the Precincts 1 and 2 were both underpopulated. They had to take on population. So some portion of the county is moving as a result of redistricting, regardless. And that's a figure the county doesn't bring, is what percentage of the population moves under revised A1, the map in place. But more important than that is that the individual changes made by this map were not made in such a way to protect individual places. Like, for example, one of the arguments that we just heard is that the plaintiff's demonstrative plans split individual cities. Well, that's true. Both of them split the city of Houston, for example. But the plan that was adopted by the county split the city of Humboldt. It also split important census-designated places such as Aldine, Sheldon, and Atascocita. So this notion that the splitting of cities and moving of streets makes it impossible for the plaintiffs to establish liability under Precinct 2 is not supported by any of the four cases we cite. And those four cases have created uniformity among the circuits that this court should be discussing. Thank you. Thank you, Mr. Dunn. Thank you, Ms. Sandill and counsel for the briefing arguments.